1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                          :
     Plaintiff,        :
                          :
vs.                   :    Criminal No. 07-127
                          :
MICHAEL PAUL JOHNSON,    :    TRANSCRIPT OF HEARING
                          :
     Defendant.       :
- - - - - - - - - - - - - X

                      Courtroom, Second Floor
                      U.S. Courthouse
                      East First and Walnut Streets
                      Des Moines, Iowa
                      Monday, November 17, 2008
                      1:30 p.m.

BEFORE:  THE HONORABLE ROBERT W. PRATT, Chief Judge.

APPEARANCES:

For the Plaintiff:       CRAIG P. GAUMER, ESQ.
                       Assistant U.S. Attorney
                       U.S. Courthouse Annex
                       110 East Court Avenue
                       Des Moines, Iowa  50309

For the Defendant:       J. KEITH RIGG, ESQ.
                       418 Sixth Avenue
                       Suite 200
                       Des Moines, Iowa  50309

     CHRISTINE E. NUCKOLLS - CERTIFIED SHORTHAND REPORTER

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| For the Defendant: | | | | |
| Dan L. Rogers | 5 | 21 | 35 45 | 38 |

E X H I B I T S

| DEFENDANT'S EXHIBITS | OFFERED | RECEIVED |
|----------------------|---------|----------|
| A - Rogers' CV | 6 | 6 |

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  Mr. Johnson, did you

3    have the opportunity to have read the presentence report that

4    was prepared in your case?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  All right.  And did you have time to talk

7    to Mr. Rigg about the report and about the issues that are

8    before me here today?

9            THE DEFENDANT:  Yes.

10           THE COURT:  All right.  Thank you.

11           Mr. Rigg, did you read the report in this case and

12   have time to discuss the report with Mr. Johnson?

13           MR. RIGG:  Yes, I did, Your Honor.

14           THE COURT:  Thank you.

15           Mr. Gaumer, on behalf of the United States, have you

16   read the report in the case?

17           MR. GAUMER:  Yes, I have.

18           THE COURT:  All right.  And, Mr. Rigg and Mr. Gaumer,

19   in whatever order--why don't we go first with the Government--

20   other than the ultimate sentence, which I know is always an

21   issue, can you tell me what issues I have to resolve before

22   arriving at an advisory guideline and then any issues beyond

23   that?

24           MR. GAUMER:  Your Honor, if I interpreted the

25   pleadings by--the briefing by the parties, I don't believe there

4

1   is any dispute as to the guideline calculation.  I believe the

2   nature of the contention between the parties is the 3553(a)

3   factors and the ultimate sentence.

4            THE COURT:  All right.

5            Is that the case, Mr. Rigg?

6            MR. RIGG:  Yes, Your Honor.

7            THE COURT:  I got a memo from the probation officer.

8   Did you want a portion of the report deleted?  Ms. Dietch told

9   me in a memo of June 12th--

10           MR. RIGG:  Can I have a second?

11           THE COURT:  Yes.

12           (Short pause.)

13           MR. RIGG:  There was a certain part that factually we

14   dispute as to what happened.  It does not go to the actual

15   guideline range.

16           THE COURT:  As you know, I accept everything that's in

17   the report unless it's contested.  So if it's contested, and you

18   need a finding on it, I have to make it.  Otherwise, if you

19   don't need a finding on it, I won't address it.

20           MR. RIGG:  Since it doesn't go to any of the

21   calculations, I don't know that there is a specific finding that

22   needs to be made.  We just know that we disagreed with the

23   presentation of what had occurred.

24           THE COURT:  All right.  You agree with the advisory

25   guidelines as calculated by the writer?

ROGERS - DIRECT

5

1          MR. RIGG:  Yes.

2          THE COURT:  Okay.  And then since there's no argument

3  about the advisory guideline, Mr. Rigg, I know that you had

4  requested, by virtue of your brief that I read, a variance from

5  the guideline.  I have the guideline at 121 to 151, and the

6  mandatory of 60 months.  You don't think it's a mandatory

7  minimum because you advocate probation.  That's my understanding

8  of your legal argument.

9          MR. RIGG:  As I recall, in the last week or two I

10  believe there's actually been a holding--I think at the circuit

11  level--that it does, in fact, require a five-year mandatory

12  minimum.

13          THE COURT:  Right.

14          MR. RIGG:  So I'm precluded from that argument.

15          THE COURT:  I think that's the Ninth Circuit.  I don't

16  think there is any Eighth Circuit law.

17          Mr. Rigg, if you want to proceed, you may do so.

18          MR. RIGG:  At this time we would ask to call Dr. Dan

19  Rogers.

20          DAN L. ROGERS, DEFENDANT'S WITNESS, SWORN

21                    DIRECT EXAMINATION

22  BY MR. RIGG:

23  Q.  Would you state your full name and spell your last name for

24  us, please.

25  A.  Dan Loren, L-O-R-E-N, Rogers, R-O-G-E-R-S.

1 Q.  And you have provided me with what has been marked as

2 Defendant's Exhibit A, which is a curriculum vita of your

3 academic and work history; is that correct?

4 A.  Yes.

5 Q.  Is the information contained in that document accurate?

6 A.  Yes.

7            MR. RIGG:  Offer A.

8            MR. GAUMER:  No objection, Your Honor.

9            THE COURT:  Received.

10                          (Defendant's Exhibit A was offered

11                           and received in evidence.)

12 BY MR. RIGG:

13 Q.  Briefly--  First of all, why don't you tell us your

14 occupation.

15 A.  I'm sorry?

16 Q.  Why don't you tell us your occupation.

17 A.  I'm sorry, I couldn't hear you.

18            THE COURT:  Your occupation.

19 A.  I'm a licensed psychologist, Iowa license No. 535.

20 Q.  And how long have you been a licensed psychologist?

21 A.  Since 1976.

22 Q.  What's your general educational background?

23 A.  Bachelor of Arts in pure mathematics from the University of

24 Texas in 1970, Master of Arts in clinical psychology in 1974

25 from Arizona State University, a Doctor of Philosophy from

ROGERS - DIRECT

7

1   Arizona State in clinical psychology in 1975 and a fellowship

2   and internship at the Mayo Clinic from '73 to '74.

3   Q.   And once you finished with the Mayo Clinic, then did you

4   have the opportunity to teach?

5   A.   Yes.  I was tenured faculty at the University of

6   Saskatchewan in the doctoral clinical psychology program.  Then

7   I taught at the University of Wisconsin in Oshkosh in their

8   graduate program.

9   Q.   Have you also worked as a clinical psychologist in various

10  places?

11  A.   Yes.

12  Q.   Briefly, what are those?

13  A.   Following faculty positions, I was on the staff of

14  hospitals.  In 1980 I was invited to join the staff of the Mayo

15  Clinic and the associated hospitals.  Since 1986 I've been in

16  private practice in Fort Dodge, the last two years in solo

17  practice.

18  Q.   Do you have a particular specialty in your practice?

19  A.   I'm a clinical psychologist with a subspecialty in forensic

20  psychology.

21  Q.   And what specific training have you had in forensic

22  psychology?

23  A.   Well, it was like supervised experience and workshops

24  designed for that purpose.

25  Q.   And how long have you been doing forensic examinations?

1  A.  About 15 years.

2  Q.  Have you testified in court before?

3  A.  Pardon?

4  Q.  Have you testified in court before?

5  A.  Yes.

6  Q.  Approximately how many times?

7  A.  You'd think it would be easy to collect those numbers.  It's

8  not.  Approximately 400 times.

9  Q.  As a psychologist?

10  A.  Yes.

11  Q.  Do you belong to any professional memberships or boards?

12  A.  Yes.

13  Q.  And what would those be?

14  A.  I'm a member of the American Psychological Association, the

15  Iowa Psychological Association, the International Rorschach

16  Society and appropriate divisions of the American Psychological

17  Association, such as clinical psychology and forensic psychology

18  in law.

19  Q.  Have you held any leadership positions in any of those

20  groups?

21  A.  Yes.

22  Q.  What would those be?

23  A.  I was elected to the board of the Minnesota Psychological

24  Association, and I was appointed by the Governor for three

25  three-year terms to the psychology licensing board in Iowa.

1  Q.  Did you serve as an executive to that board, as well?

2  A.  I was president of the board for a couple of years.

3  Q.  Have you had the opportunity in the past to conduct forensic

4  examinations concerning persons who have been involved with--to

5  use a loose term--child pornography?

6  A.  Yes.

7  Q.  When do you think you would have first become involved in

8  examinations such as that?

9  A.  When I was at the University of Saskatchewan.

10  Q.  That would have been how long ago?

11  A.  That would have been 30 years ago.

12  Q.  Have you reviewed any of the relevant literature concerning

13  the subject matter in determining the appropriate basis for

14  conducting such an examination?

15  A.  Yes.

16  Q.  And why don't you just explain to the Court generally the

17  research that you're familiar with and what it says once you're

18  doing such an examination.

19  A.  Well, it's hard to summarize.  There are several bodies of

20  research that are relevant.  First is testing and measurement as

21  a scientific field and the progress and nature of scientific

22  investigation itself.

23       Then there is a body of research on normal sexual

24  behavior, a body of research on pornography, per se, and a body

25  of research on sexual offenders, which is more confusing than

ROGERS - DIRECT

10

1  most because there's a lot of political pressure applied to

2  investigators there.

3          But I try to stay up on all the different areas of

4  research, and I'm in several informal discussion groups that

5  deal with it.

6  Q.  Okay.  You said that there are some standard testing devices

7  which you use that's normally used by a psychologist in doing

8  evaluations; is that correct?

9  A.  Yes.  I don't want to mislead you, though, into thinking

10 that I believe that there is a specific test for evaluating

11 sexual offenders.  There are some, but they don't meet standards

12 for either scientific investigation or standards for use of

13 tests by either psychologists or educators.

14 Q.  Okay.  You had the opportunity to exam Dr. Johnson; correct?

15 A.  Yes.

16 Q.  And what background materials were you aware of going into

17 the examination?

18 A.  I had read the presentence investigation report that you

19 provided to me.

20 Q.  And why don't you just explain to the Court kind of what it

21 is you do first, second, third in order to conduct such an

22 examination.

23 A.  I follow the procedure that's recommended by major scholars

24 in the area of assessment of sexual offenders, such as Richard

25 Lanyon, who has written the most notable text on evaluating

1  sexual offenders of any sort.

2         That requires--usually requires a review of the

3  individual's records.  However, when the individual has already

4  pled or is expected to plead, really, most of those issues are

5  no longer relevant to me.  So I prefer to usually accept the

6  facts in a presentence investigation report.

7  Q.  And is that what you did in this case?

8  A.  Yes.

9  Q.  Okay.

10 A.  Then I conduct a mental status examination of the individual

11 and a series of psychological tests to look at issues such as

12 personality and emotional functioning, cognitive deficits,

13 judgmental capabilities and anything else that appears relevant.

14 Q.  And specific to Dr. Johnson, what tests did you perform?

15 A.  I gave you a list of spellings if the court reporter needs

16 them.

17 Q.  Yeah.

18 A.  The Minnesota Multiphasic Personality Inventory-2.

19 Q.  And what is that?

20 A.  That's a 567-question true/false test that is the most

21 frequently used and most frequently studied test of personality

22 and emotional functioning.

23 Q.  The MMPI-2 is a standard test to be given in a general

24 assessment; is that correct?

25 A.  Yes.

1  Q.  Okay.

2  A.  I administered the Rorschach inkblot technique using the

3  comprehensive system.

4  Q.  And what is that used for?

5  A.  Well, it's not like the old Rorschach test where you

6  essentially eyeballed it and interpreted what the person says.

7  There is an extremely large body of data that's been collected

8  and specific techniques for scoring the responses.  And those

9  scores are highly correlated with a test like an MMPI, but are

10  more specifically correlated highly with studies on specific

11  behaviors in order to gain information about the individual's

12  problem-solving style, reality testing and facets of their

13  functioning like that.

14        But it's basically a problem-solving test that's

15  scored on the basis of the different cognitive processes that go

16  into solving problems.

17  Q.  Okay.  What other test did you perform?

18  A.  The Bender-Gestalt Visual-Motor test.

19  Q.  And what is that test designed to perform?

20  A.  It's a set of nine geometric figures that's been around

21  since 1920 to 1930.  I use it for two reasons.  One, it's a good

22  ice breaker.  It's a very simple test, and it gets rid of a

23  whole lot of anxiety in the subject.

24        It's also widely used as a screening test to determine

25  if there is reason to follow up on certain kinds of organic

ROGERS - DIRECT

13

1  brain deficits.

2  Q.  And did you employ any other tests, written tests?

3  A.  Yes, I did.

4  Q.  What was that?

5  A.  The Trail Making Test, which is a basically connect-the-dots

6  sort of test, which part of it requires connecting ascending

7  alphabet letters and numbers in alternating form.  That just

8  assesses cognitive flexibility.

9  Q.  And were there any other formal tests such as you've been

10  discussing here?

11  A.  The Stroop Color and Word Test, which simply requires the

12  individual to name the colors of words as they're printed or

13  name the colors of Xs that are printed or to name the colors of

14  words, but not the words themselves when what's printed is a

15  word, such as blue, but it's printed in a different color.  That

16  also measures a type of cognitive flexibility and ability to

17  concentrate on the relevant task rather than irrelevant task.

18          Finally, I administered what's called the Controlled

19  Oral Word Association test, which simply requires the individual

20  to state as many words as they can within one minute, beginning

21  with specific letters of the alphabet.  And that has to do with

22  their linguistic facility, their ability to dredge up words that

23  meet a very simple concept.

24  Q.  Is there other components of the examination besides the

25  testing portion?

ROGERS - DIRECT

14

1   A.   There is a mental status examination.

2   Q.   And why don't you explain to us what all you do to perform

3   that portion of the examination.

4   A.   That's simply an interview.  But during the interview you

5   specifically make observations that relate to a variety of very

6   specific behaviors or historical behaviors, such as drinking

7   behavior, the individual's grooming, any abnormalities in their

8   speech pattern or just a variety of behaviors.

9   Q.   Based on both the written and the interview portion of the

10  examination, were you able to reach any conclusions or opinions

11  as to whether or not Dr. Johnson was being honest and helpful in

12  the examination?

13  A.   Yes.

14  Q.   And what did you find?

15  A.   The results indicated that he made a good effort to present

16  himself accurately on the different tests rather than to present

17  himself as either more disturbed or disordered or less disturbed

18  or disordered than he actually is.

19  Q.   And from these findings it would be your conclusion that the

20  testing would be valid as per him?

21  A.   Yes.

22  Q.   And after completing the examination and scoring the test,

23  were you able to come to certain conclusions as to Dr. Johnson's

24  mental status?

25  A.   Yes.

1  Q.  And what conclusions did you reach?

2  A.  He met the diagnostic criteria for a relatively mild stage

3  of bipolar affective disorder, which used to be called manic

4  depression, with a good chance of there being an underlying

5  dysthymic disorder, which is a moderate form of chronic

6  depression.  In addition, he meets the diagnostic criteria for a

7  depressive personality disorder.

8         He did not meet the diagnostic criteria for

9  pedophilia.  He did not meet the diagnostic criteria for

10 antisocial personality disorder.

11 Q.  Of the last two-- First of all, why don't you explain to

12 the Court what the criteria is for either antisocial personality

13 disorder or pedophilia.

14 A.  Antisocial personality disorder requires that the individual

15 prior to the age of 15 have engaged in behaviors that deprived

16 others of their rights or property.  There are other criteria,

17 but basically it's young criminal behavior.

18         And they also have to have not just impulsivity, but a

19 preference for impulsivity rather than an inability to control

20 it.  And they have to have a lack of empathy for others and poor

21 ability to anticipate the outcomes of their actions.  None of

22 those are true for him.

23 Q.  And would that have been from both the testing and the

24 interview portions of the examination?

25 A.  Yes, mostly from the testing.

ROGERS - DIRECT

16

1   Q.   Okay.   How about pedophilia?

2   A.   Pedophilia is a preference, to a degree, to cause us

3   problems in different aspects of one's life, a preference for

4   prepubescent males or females.

5   Q.   And, diagnostically, what is it that you look for in order

6   to see if those criteria would be met?

7   A.   There has to be assertive demonstration that the individual

8   has that preference, and there simply wasn't anything to

9   indicate assertively that he has a sexual preference.   His

10  relationships, so far as I was able to determine, have been

11  heterophilic.

12  Q.   And is there anything in the testing portion which would

13  have contraindicated that kind of preference?

14  A.   No, there's no valid and scientifically accepted test for

15  that.

16  Q.   So what you would have to look at is the interview part,

17  basically?

18  A.   There are some things that you would expect if somebody is a

19  pedophile.   You would expect to find some level of immaturity.

20  You would expect to find some level of impulse control disorder

21  or preference and a lack of empathy.   He didn't meet any of

22  those criteria.

23  Q.   Okay.   You mentioned that one of the things that you found

24  was what used to be called obsessive compulsive disorder.   As

25  you know from the PSI, there were a number of images that were

1  found.  Would that be consistent with somebody with that type of

2  disorder?

3  A.  I'm not sure--  Did you say obsessive compulsive disorder?

4  Q.  Yes.

5  A.  No, I said manic depressive disorder.

6  Q.  I'm sorry.  Manic depressive disorder.  Would the fact that

7  a number of different images were found in this particular case,

8  would that be something that can be consistent with that

9  diagnosis?

10  A.  Oh, yes.

11  Q.  How so?

12  A.  Classically, one of the major components of bipolar disorder

13  of the sort that used to be called manic depressive disorder is

14  an interest in--irrelevant of one's sexual preferences--in

15  sexual images, sexual jokes, inappropriate teasing, flirting

16  that has nothing to do with the individual's actual sexual

17  behavior.

18  Q.  So you would see that kind of activity as being consistent

19  with the mental status of Dr. Johnson?

20  A.  Oh, yes.

21  Q.  Do such people tend to collect things?

22  A.  Very often--  Yes, very often there is compulsive behavior,

23  which would include collecting.

24  Q.  Based on the results of your examination and the diagnosis

25  that you came up with, did you have any other opinions

1   concerning Dr. Johnson?

2   A.   Yes.

3   Q.   What were those opinions?

4   A.   He has a child born with a genesis of the corpus callosum.

5   The incidence of fathers of such children is very high that they

6   have Asperger's type symptoms, which is an autistic spectrum

7   disorder which could be part of a bipolar disorder or separate.

8   But collection, again irrelevant of behavior, is also part of

9   that disorder.

10  Q.   Any other conclusions that you made?

11  A.   No.

12  Q.   Were you able to come to some assessment of Dr. Johnson's

13  risk for reoffending?

14  A.   Yes.

15  Q.   And what conclusions did you reach?

16  A.   His risk of reoffense is very low.

17  Q.   And why would that be?

18  A.   First, pornography offenders as a group are statistically

19  very low for reoffense.  Whatever the reasons, just the

20  statistics indicate that it's very low.  The rate of any

21  reoffense is very low in Iowa anyway, and the rate for

22  pornography offenders is lower than that.

23  Q.   Can you give some sort of number attached to that?

24  A.   Well, they're pretty bad data.  But the Department of

25  Corrections' data indicated approximately 3 percent of reoffense

1   for the highest risk groups, which were individuals imprisoned

2   for sexually violent offenses in Iowa.  There are no reliable

3   data on most other offenses in this state and, really, not very

4   many throughout the country.  There are a lot of unreliable

5   data, but nothing that's accepted in the scientific community.

6          In addition to that, he doesn't display the primary

7   risk factors, such as specifically antisocial tendencies or

8   personality disorder.  He just simply doesn't have one.  He

9   doesn't have a major psychosis.

10          He didn't show any desire that would document at least

11   a financial profit from pornography.  He doesn't have a

12   substance addiction, and he doesn't have low intellect.  Those

13   are the major risk factors, and he doesn't have any of them.

14   Q.   Did you--  Go ahead.

15   A.   Then there's nothing to indicate that he has abnormal sexual

16   interests.  This behavior to which he pled is illegal, but

17   interest in minors who are postpubescent is not abnormal.

18   Q.   From your work with Dr. Johnson, would it be fair to say

19   that you believe that continuing treatment would be helpful or

20   needed for him?

21   A.   Yes.

22   Q.   What kind of treatment do you believe is necessary?

23   A.   Some good studies have come out recently that indicate that

24   community-based treatment with a high component of noncoercive

25   group treatment combined with individual psychotherapy as

1   opposed to counseling has the best outcome for individuals such

2   as him, particularly with a bipolar disorder, in which case

3   post-medical management would also be required.

4   Q.   And what do you mean by post-medical management?

5   A.   Most people with a bipolar disorder respond best if they

6   receive appropriate medications for that disorder, but it also

7   has to be monitored because they don't usually like the effects

8   of the medication.

9   Q.   Assuming for the moment that he gets the necessary treatment

10  and medication, do you have an opinion as to his prognosis

11  ultimately?

12  A.   To what?

13  Q.   His prognosis ultimately.

14  A.   His prognosis should be very good.

15  Q.   So with such continued treatment and therapy, is there any

16  reason that he would not be able to join society and be a law-

17  abiding citizen?

18  A.   No.   I've, over the years, known a number of individuals

19  like him, including when I supervised residents at the Mayo

20  Clinic, with similar disorders who have done notably well.   Some

21  of them their names would be recognized as outstanding in their

22  field.   But they did have to stay on their medications, and they

23  did have to get follow-up therapy.

24            MR. RIGG:   Thank you.   Nothing further.

25            THE COURT:   Mr. Gaumer.

1                        CROSS-EXAMINATION

2    BY MR. GAUMER:

3    Q.   Doctor, do you hear me okay?

4    A.   Barely.

5    Q.   Earlier you talked about the recidivism rate, I believe, for

6    pornographers.  My question, I'm just curious, is there a

7    different recidivism rate for child sex offenders that you're

8    familiar with?

9    A.   I'm sorry?

10   Q.   Would there be a different recidivism rate for persons who

11   would sexually offend against children?

12   A.   Probably, yes.

13   Q.   Would that be higher or lower than the recidivism rate for

14   people who just look at pornography?

15   A.   The best data indicates that it's higher.  But there's two

16   recidivism rates there, depending on whether they're offenses

17   against children in one's own family, specifically genetically

18   their own children, or children outside the family.

19            Offenders against children outside their family are

20   at highest risk.  It's not clear what the offense rate is for

21   offenses against--in one's own family because the reporting rate

22   is difficult to determine.

23   Q.   And you'd agree with me there is no indication in this case

24   that there was any sexual offenses involving Dr. Johnson's

25   family.  That's not an issue here; right?

1    A.   I'm sorry, I didn't hear that.

2    Q.   This case doesn't involve the other recidivism rate you just

3    talked about; there is no indication in this case that there is

4    any conduct by Dr. Johnson against members of his own family?

5    A.   The best data there are indicates that it's a very low

6    recidivism rate for individuals whose only offense is child

7    pornography, possession or distribution.

8    Q.   But if it's a sex offense against a child, the recidivism

9    rate is much higher?

10   A.   Sex offenses, specifically pedophilia for prepubescent

11   children outside the family, it tends to be a high rate of

12   reoffense.  But again, it has to be broken down into whether or

13   not there are other disorders present.

14   Q.   Okay.  Did you look at the images that Dr. Johnson had?

15   A.   No.

16   Q.   Do you have any idea what the breakdown is in those images

17   concerning prepubescent or postpubescent?

18   A.   No, I understand there were some of both.

19          THE COURT:  Mr. Gaumer, can I interrupt a second?

20          Dr. Rogers--and maybe the lawyers have a different

21   memory than I do--the only figure that I have that you talked

22   about recidivism was a 3 percent rate with regard to DOC.  I

23   assume that's the Department of Corrections?

24          THE WITNESS:  Yes, sir.  That's the only one I've

25   seen.

1          THE COURT:  And that 3 percent, that was for sex

2  crimes in general.  Am I right, that's the only figure you gave?

3          THE WITNESS:  Yes, sir; over a three-year period.

4          THE COURT:  3 percent over a three-year period?

5          THE WITNESS:  That's right.

6          THE COURT:  Thank you.

7          MR. GAUMER:  I'm going to follow up on that, Your

8  Honor.

9  Q.  Dr. Rogers, I think the Judge and I and all of us in the

10  courtroom want to make sure we're clear.  On the recidivism rate

11  that you discussed first, the 3 percent rate, does that rate

12  involve persons who just look at child pornography or who look

13  at any type of pornography?

14  A.  I don't know.  That's for all incarcerated sexual offenders

15  during that period of time.  I don't know of it being broken

16  down that specifically.

17  Q.  How old is that data?

18  A.  I'm sorry?

19  Q.  How old is that data?

20  A.  Five years.

21  Q.  And you don't have anything nationwide; that's just Iowa

22  data?

23  A.  There really hasn't been any nationwide scientifically

24  accepted collection of those data.

25  Q.  Not that you're aware of; is that correct?  Not that you're

1   aware of?

2   A.   I would be aware of it.

3   Q.   Now, you prepared a psychological assessment report in this

4   case--I believe it was back in June.  Do you recall that?

5   A.   Yes.

6   Q.   Do you have that with you, the five-page report?

7   A.   Yes, sir; I do.

8   Q.   Now, am I correct that most of your conclusions in your

9   report are based on your testing, your observations and the

10  reporting that was given to you either by the Defendant or in

11  the presentence report?

12  A.   No.

13  Q.   Is there something else?

14  A.   Yes; I accepted factual data in the presentence

15  investigation, and it was also based on my knowledge of the

16  scientific literature.

17  Q.   Okay.  So obviously your knowledge of the scientific

18  literature.  As far as the data is concerned, your conclusions

19  were based on your knowledge--the facts came from your

20  interviews with the Defendant, the tests that he took and the

21  presentence investigation report?

22  A.   Yes.

23  Q.   Are you aware that the Defendant told FBI agents that he was

24  involved in collecting child pornography, but he stopped when he

25  became aware that the FBI was cracking down on persons in some

1  professions?

2  A.  I'm aware of the time line.  I'm not aware of the specific

3  statement.

4  Q.  According to your report the Defendant, at least at some

5  point, began seeking out pictures of three particular, I

6  believe, similar girls; is that correct?

7  A.  Can you say that again.

8  Q.  I'm looking at Page 3 of your report.  At one point the

9  Defendant--about the fourth paragraph--Defendant became sexually

10  aroused and was masturbating frequently in response to three

11  pictures that were his favorites and they were of teenage girls;

12  is that correct?

13  A.  Yes, there were girls that resembled girls that he had gone

14  to school with.

15  Q.  Do you know from your research into this case and your

16  observations when the Defendant started collecting, receiving

17  child pornography?

18  A.  It's in my report.  I would have to find it here.

19  Q.  Go ahead.

20  A.  That was at about the time he started to attend medical

21  school.

22  Q.  According to the presentence investigation report, the only

23  evidence the Government has of his collecting child pornography

24  began sometime in 2003.  So you have some other data that told

25  you that he started collecting child pornography two years

ROGERS - CROSS

26

1  before that?

2  A.  Well, he said he became interested in pornography, not child

3  pornography.  I was only answering in terms of pornography in

4  general.  He said he became interested in pornography about the

5  time he began medical school, and that sometime later he

6  received some child pornography or encountered some.

7  Q.  You don't have any idea when the Defendant's behavior

8  evolved from looking at adult pornography into child

9  pornography, do you?

10  A.  I'm not sure that there would be any characterization that

11  there was a new development.  He discussed it, but it wasn't

12  important to me specifically when it occurred.

13  Q.  And is it your understanding, as I read your report, that he

14  started collecting child pornography when he was lonely?

15  A.  When what?

16  Q.  When he was lonely.  Is that one of the contributing

17  factors?

18  A.  No, that's not my understanding.

19  Q.  I'm looking at the top of Page 3, and your report talks

20  about the Defendant being very lonely when he was away from his

21  parents and refers to when he went to medical school he was not

22  able to leave his apartment.  He told you that; is that correct?

23  A.  That's correct.

24  Q.  After that he became interested in adult pornography and

25  found adult pornography on the internet and encountered child

1  pornography.  Is that what he told you?

2  A.  I don't know if it was after.  It was about the same time.

3  I don't know if any causal relationship exists between them, if

4  that's what you're asking me.

5  Q.  Now, your definition of pedophilia is persons who are

6  sexually attracted to prepubescent minors?

7  A.  It's not mine.

8  Q.  The one you're using.

9  A.  It's the accepted definition.  That's the one in the

10  Diagnostic and Statistical Manual.

11  Q.  The DSM?

12  A.  Yes.

13  Q.  And you talk about on Page 5 of your report certain

14  characteristics, I think, of pedophilia.  And to be a pedophile

15  person do you have to have antisocial tendencies?

16  A.  I'm sorry?

17  Q.  Do pedophiles have to have antisocial tendencies?

18  A.  No.  That's a risk factor of recidivism, though.

19  Q.  Do persons who are at high risk of recidivism or have any

20  risk of recidivism have to desire to financially profit from

21  pornography?

22  A.  No, but it certainly is a high risk factor.

23  Q.  What about persons who instead of profiting from pornography

24  monetarily, they proffer from child pornography by trading it

25  with other people.  Would you agree with me that the more

1  immersed the person is within the trade of child pornography,

2  that would be a greater risk factor as far as recidivism?

3  A.  I don't know of any data on that.  I don't know.

4  Q.  And a person does not have to be a substance abuser to have

5  a risk of recidivism, do they, necessarily?

6  A.  Risk is a statistical probability, and in order to say it is

7  a risk or not a risk you have to take those factors into account

8  to actually answer that question.

9        So the basic answer is no, but you can't make a

10  statement about risk without there being some of those factors.

11  Otherwise, the chance of risk is so low as to be practically

12  zero.

13  Q.  Well, but you can be antisocial and have a substance

14  addiction and a low intellect and not be interested in child

15  pornography?

16  A.  Well, that's correct.  But, see, that's just the problem.

17  Most antisocial personalities never get into trouble.  Neither

18  do most individuals with these other characteristics.  The base

19  rate for child pornography is extremely low because most of the

20  people with those characteristics don't do any of these things.

21        We don't know what causes people to do them to start

22  with, but we do know that there are certain risk factors for the

23  likelihood of their doing it again once they've been caught.

24  Q.  And would one of the greatest risk factors be the degree or

25  extent, if it could be measured, of how much someone was

1  attracted sexually to children?

2  A.  You would think so.  I don't know of any data on that.

3  There seems to be quite a bit of difference between

4  psychological processes between looking at pornography and being

5  attracted to children.  And so you just simply can't equate the

6  two.

7          Children who commit sexual offenses against children--

8  People who commit sexual offenses against children, especially

9  prepubescent children, have fairly well known risk factors.

10  Even then the rate is very low.

11          People who view pornography, the only known effect of

12  that behavior is looking at more pornography.  It can be illegal

13  to do.  I'm not saying I approve of it, but they seem to be two

14  totally different problems.

15  Q.  I guess the question I want to talk about real briefly, in

16  your report you talk about the Defendant did not understand his

17  need for skilled insight for psychotherapy.  What do you mean by

18  that?

19  A.  Like most individuals who have a bipolar-type disorder, they

20  either deny or because of brain processes don't fully understand

21  that they need to deal with the issues their behavior causes for

22  other people and with the processes of their own thinking.

23          They pretty well have to be urged into it.  And once

24  they get into it, then they tend to find the support to be very

25  useful.  And he also doesn't recognize that need very well.

1  Q.  So it would be your testimony that he actually does need

2  skilled insight more into psychotherapy?

3  A.  Yes.

4  Q.  And at this point--correct me if it's changed since

5  June--but at this point he does not really understand that he

6  really needs that?

7  A.  Well, he knows he needs treatment.  He doesn't know he needs

8  one component of treatment.  That would be for pornography.

9          MR. GAUMER:  That's all the questions I have, Your

10  Honor.

11          THE COURT:  Mr. Rigg?

12          MR. RIGG:  Nothing further.

13          THE COURT:  Dr. Rogers, the Government filed a report

14  on Friday that I just got read this morning.  I'm going to

15  paraphrase what I think it says, and the lawyers may follow up

16  and have a different impression, but essentially--  You haven't

17  read this study, I take it?

18          THE WITNESS:  Which study?

19          THE COURT:  Well, there's a study.  It's called the

20  Butner Study, a Report of the Incidence of Hands-on Child

21  Victimization By Child Pornography Offenders.  And the authors

22  are Michael L. Bourke, B-O-U-R-K-E, and Andres E. Hernandez.

23          THE WITNESS: Yes, sir; I've read it.

24          THE COURT:  You've read it.  Okay.  Here's my

25  layperson impression of this; that one--the presumption that one

1  who merely, I put that in quotes, views pornography has not done

2  any hands-on abusing of children is a myth.

3          THE WITNESS:  That's what they apparently would wish

4  to be believed.  Speaking only as a scientist, because I don't

5  have anything to gain or lose either way, I much prefer

6  disconfirmation anytime I can see it.  There are several things

7  missing from their report.

8          First, the individuals in treatment there, the

9  treatment is highly coercive.  Unless they admit to certain

10  behaviors, whether or not they committed them--and this has been

11  published--

12          THE COURT:  Well, now, here's what they said about

13  that.  They said none of these people in this study had anything

14  to gain because none of them could be paroled.  They were given

15  determinant sentences.  So whether or not they cooperated in a

16  sex offender treatment program was not an incentive for them to

17  do anything.

18          THE WITNESS:  I understand that.  That isn't the way I

19  believe it worked out from their own description.  They didn't

20  report on why people were discharged from the program or kicked

21  out of it.

22          But typically when people use the Abel assessment

23  instrument, which is kind of a lie detector that's attached to

24  the penis, unless they admit to further offenses they're kicked

25  out of the programs, whether they committed them, or not.

1    That's a major problem with the whole approach, which is why

2    it's not accepted in the treatment community or in the

3    scientific community.  So they didn't report on that.

4           Also, the statistics they use simply do not show what

5    they said.  They're inappropriate statistics.  And if they could

6    find that, that would help me, because I would like to be able

7    to make stronger statements one way or the other.  I don't care

8    which way it goes.

9           But when I looked at their data and the statistics

10   they used, they just don't fit.  I just don't see where they can

11   draw their conclusions.  It's not a published article, it's not

12   peer reviewed, and I think a peer review would be pretty

13   uncomfortable for them because it doesn't meet normal standards

14   for research.

15          If somebody can show that, I'll accept it.  But this

16   article doesn't really show anything that I could determine.

17          THE COURT:  Okay.  Well, here's just again my

18   layperson understanding of this.  When we nontrained people like

19   myself, when we say or conclude that so-and-so is not likely to

20   be dangerous because there's no evidence, this study seems to

21   indicate that that alone, the fact that there's no evidence,

22   that that alone shouldn't reassure any of us that viewers are

23   not dangerous.

24          THE WITNESS:  I understand that.  That's where issues

25   like Daubert come in.  If it meets scientific standards of the

1   accepted relevant scientific community, then I'm going to accept

2   it.  And I would tell people that that individual is probably

3   more dangerous than I thought.

4           THE COURT:  Okay.  Well, let me ask you this:  Since

5   you're familiar with the study, can you tell me how the

6   statistics or the methodology of the study is wrong?

7           THE WITNESS:  The question they were asking doesn't

8   have any technique to actually differentiate between the two

9   groups.  They simply took two groups that were different from

10  the start, and then the passage of time and treatment was

11  supposed to make some difference, but they were already

12  different from the start.

13          So for them to conclude that they're different because

14  of their hypothesis is meaningless because they were already

15  different groups.  They were two totally different groups

16  divided according to different criteria.

17          THE COURT:  Let's just take the group that said they

18  had no hands-on offense.  That's the only group I'm talking

19  about, okay?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Here's my understanding of that group.

22  They said that 85 percent to 98 percent of that group had, in

23  fact, offended.  Is that your understanding of their conclusion?

24          THE WITNESS:  I believe so.

25          THE COURT:  Okay.  So what two groups are you talking

1  about?  I'm only talking about the group that were, quote, mere

2  viewers.

3          THE WITNESS:  No.  Their conclusions are based on the

4  comparison of two groups that they divided.  They had two

5  totally different groups, and their conclusions are based upon

6  that.  Their statistics aren't appropriate anyway because the

7  scales that they used weren't appropriate.

8          But your confusion and my confusion are both the

9  result of the same thing.  What they say makes intuitive sense

10  in a way, but it's not based upon their data.

11          THE COURT:  I got that a little bit wrong.  Here's

12  what my law clerk tells me is that 85 percent admitted that they

13  had hands-on offenses, 85 percent of the, quote, mere viewers.

14  Only 2 percent passed a polygraph test when they said they had

15  done anything physical in the study.

16          THE WITNESS:  Yes, sir.  In order to assess that, you

17  have to know more about the Abel technique, which is what they

18  used.  And that requires that they admit things, or they lose

19  privileges.

20          THE COURT:  Okay.  Dr. Rogers, here's my concern:  One

21  of the things--of the many factors that Congress tells we judges

22  that we are supposed to consider is 3553(a)(c), to protect the

23  public from further crimes of the Defendant and the

24  dangerousness of the Defendant.

25          Can you give me any help with respect to--based upon

1   your testing with respect to both of those factors?

2          THE WITNESS:  I can only offer you what I, myself,

3   have learned as a scientist, which is that there have been years

4   of research on that question that have not found that result,

5   research that has been published in peer-reviewed journals, and

6   the result just isn't out there.

7          This is something produced within a prison program, it

8   isn't scientifically vetted, it doesn't meet scientific

9   standards for research, and it's based upon, frankly, an

10  incoherent design for a study.

11         So it's basically trying to prove a negative when you

12  look at it.  All I can say is all these years of research

13  haven't found it, and this hasn't been reviewed by any known

14  researchers in the area.

15         THE COURT:  Mr. Gaumer or Mr. Rigg, do you have any

16  questions following up?

17         MR. RIGG:  Yes.

18                      REDIRECT EXAMINATION

19  BY MR. RIGG:

20  Q.  Dr. Rogers, you're familiar with the scientific method;

21  correct?

22  A.  Oh, yes.

23  Q.  Would it be fair to say that the scientific method would

24  demand that in selecting subjects for a study that there should

25  be a random selection rather than a self-selection of subjects?

1   A.  Usually it doesn't have to be random if it's controlled in

2   some fashion so that you know what the effects are of starting

3   out the groups differently and if you can control that

4   statistically.

5   Q.  Was there a random selection in this study?

6   A.  There was no selection, except one of convenience.

7   Q.  And did you see any controls that were ever used within the

8   study to validate the results?

9   A.  No, there was no what's called an independent variable,

10  which you have to have to draw conclusions.  You have to have

11  some variable that you can account for the change based upon

12  that variable.  There just wasn't one.

13  Q.  Doctor, are you aware of any peer-reviewed studies that

14  would be generally accepted within the scientific community that

15  would be based on the results of a polygraph examination?

16  A.  Well, there are some interesting studies there, but the same

17  things that make it a problem in research make it a problem for

18  courts.  It's not some magical response.  I've used polygraphs

19  in my own research for a different reason, but you can't

20  determine if somebody is telling the truth, or not.

21  Q.  And that's the problem with them, isn't it?

22  A.  Well, there's several problems.  There's no standard of

23  training for polygraph experts and certainly no standard of

24  training for the Abel technique, which is just a polygraph with

25  some instructions.  There's no standardized instructions, there

1  are no normative data, there's no disprovable hypothesis

2  whatsoever.

3  Q.  Do you have an opinion, based on your training and

4  experience, as to whether or not the findings in this particular

5  study should be given any particular weight?

6  A.  Could you rephrase that.

7  Q.  Sure.  Based on your training and experience, is there any

8  particular reason to give the Butner studies that we have been

9  talking about any particular weight?

10  A.  Yes.  Based upon the standards in research, I give it zero

11  weight until somebody else comes up with the same results and

12  passes a peer review process.

13  Q.  And one of the hallmarks of the scientific method is

14  repeatability of results; is that correct?

15  A.  Say that again.

16  Q.  One of the hallmarks of the scientific method is

17  repeatability of results; is that correct?

18  A.  Yes, repeatability.

19  Q.  And was there anything in the study which would show that

20  these results were, in fact, repeated or have been independently

21  repeated?

22  A.  To my knowledge, they haven't been repeated by anyone else,

23  and they didn't indicate that they were repeating anyone else's

24  studies.

25  Q.  Going back now to Dr. Johnson, based on everything that you

1    were able to do and everything that you saw during the course of

2    your examination of this individual, do you believe that he

3    would be a future danger to the public?

4    A.  No, I don't.

5            MR. RIGG:  Thank you.  Nothing further.

6            THE COURT:  Mr. Gaumer, I was going to ask you this

7    later, maybe now is the right time.  Did the sentencing

8    commission have this study?  I wasn't familiar with this study

9    until I just read it this morning.

10           MR. GAUMER:  Your Honor, this study just came out and

11   was available to the public in the last month or month and a

12   half or less.

13           THE COURT:  I don't remember that I had it when we had

14   the Shipley sentencing.

15           MR. GAUMER:  We didn't, Your Honor.  I just received

16   it in the last few weeks.

17                          RECROSS-EXAMINATION

18   BY MR. GAUMER:

19   Q.  Dr. Rogers, just to make sure that you and I and the Court

20   are all on the same page here, the study I'm referring to was

21   just released in the last month, or so, and is in press with the

22   Journal of Family Violence.  It hasn't been published yet.

23   You've read that study?

24   A.  Are you talking about the one by Bourke and Hernandez?

25   Q.  Well, there are a number of them by Bourke and Hernandez.

ROGERS - RECROSS

39

1  The one I'm talking about was just released in the last few

2  months called The Butner Study Review, A Portrait of the

3  Incidence of Hands-on Child Victimization By Child Pornography

4  Offenders, and is a follow-up to a previous study that they have

5  done.

6          MR. RIGG:  Your Honor, just so everybody is clear, I

7  gave the Doctor a copy that had been provided by the Government

8  to me today.  That's why he was able to read it.

9          THE COURT:  I think there was a question pending by

10  Mr. Gaumer.  Did you hear it, Doctor?

11          MR. GAUMER:  I think it's been answered by Mr. Rigg.

12          THE COURT:  Okay.

13  BY MR. GAUMER:

14  Q.  Okay.  And do you understand that what that study basically

15  did was it took 155 sexual offenders that were in the Butner

16  sexual offender treatment program and examined them

17  through--gave them a questionnaire and tried to look at the

18  incidence from which they had actually sexually offended against

19  a child?  Do you understand that's what they did?

20  A.  I don't understand that was done.  I understand that that's

21  what they said they were doing.  I don't believe that's what

22  they did.

23  Q.  What basis do you have to not believe what was in the study?

24  A.  The questionnaire they used isn't a known scientific

25  reliable questionnaire for anything and, under the techniques

1  they used, can accomplish what they said they were

2  accomplishing.

3  Q.  You've looked at the actual questionnaire that they used?

4  A.  I read what they said.  They said it wasn't a published

5  questionnaire.

6  Q.  But you have no idea what questions they asked?

7  A.  No, but it becomes irrelevant.  If you don't have normative

8  data on them, you don't know what to make of the results.  How

9  could they--

10  Q.  So a study can't be valid if you ask new questions and try

11  to get insight into new ideas?

12  A.  That's correct.  You can't have validity if you don't have

13  reliability first.  That's a hallmark of science.  And you can't

14  have validity--  You can't have reliability unless you have

15  normative data.  How can they say that they're telling us

16  anything about future risk of a population if they know nothing

17  about what their responses mean in general?

18  Q.  Validity means whether or not a study measures what it

19  purports to measure?

20  A.  That's one of its meanings.  That's correct.

21  Q.  Reliability means it's another way of measuring the same

22  thing, but it looks to whether or not if you use the same

23  criteria, the same method over time, you yield the same results?

24  A.  It can be over time, it can be within the questionnaire, it

25  can be within people or between judges.  But they didn't do any

1  of those.

2  Q.   So a first-of-its-kind study may or may not necessarily have

3  a reliability measurement unless it's done again and again and

4  again?

5  A.   No, any competent researcher would have taken that scale and

6  normed it first.

7  Q.   And what do you mean by the word "normed" the scale?

8  A.   They would have taken the scale and administered it to some

9  criterion group and collected normative data to see what, in

10 fact, the normal-type scores on that test are.   They didn't do

11 that.   I don't know of any researcher who wouldn't have done

12 that to start with.

13 Q.   And what would the normative group be?

14 A.   It depends on what they're wanting to learn.   In my case, I

15 would have taken the questionnaire and would have given it to

16 another outside group of known child molesters and known child

17 pornographers who had no known history of actually molesting

18 children.   I would have collected data first.   You have to have

19 that before you can use it in a test like this--in a study like

20 this.   And they didn't do that.

21 Q.   And you have no way of--you don't dispute the--  First of

22 all, you don't know what questions they asked; right?

23 A.   It doesn't matter.

24 Q.   Answer my question.   You don't know what questions they

25 asked?

ROGERS - RECROSS

42

1   A.  No, I don't.

2   Q.  All right.  And you have no reason to think--no scientific

3   reason to think, no factual reason to think that the persons who

4   answered the survey lied, do you?

5   A.  That isn't relevant.

6   Q.  Answer my question, please.  You have no reason to believe

7   that the persons who answered the survey lied?

8   A.  I'm answering as a scientist.

9           MR. RIGG:  If counsel wants to ask the Court to direct

10  the witness to answer, I appreciate that he do it in that

11  manner.

12          THE COURT:  Okay.  We'll get it done here.

13          Dr. Rogers, why don't you listen carefully to the

14  question.  I'm sure Mr. Gaumer will listen carefully to your

15  answer, okay.  We'll start over again.

16          Go ahead Mr. Gaumer.

17  BY MR. GAUMER:

18  Q.  Doctor, I'm not asking you about research, your opinion on

19  the research methodology here.  I'm asking some very specific

20  questions.  All right.  You weren't there when the study was

21  made; right?

22  A.  That's correct.

23  Q.  Okay.  You don't know anything about the 155 people who were

24  surveyed, other than what's in this report?

25  A.  That's correct.  That's one of the problems.

ROGERS - RECROSS

43

1  Q.  Okay.  And you do understand from reading the report that

2  the 155 people who were involved in this study were persons who

3  had been convicted of sexual offending and were in the Butner

4  sexual offender treatment program?

5  A.  That's correct.

6  Q.  And you understand that 74 percent of them, 115 total, have

7  no history, no reported history of sexual offending?

8  A.  No, I don't know that from the data they gave.

9  Q.  All right.  Do you have the report in front of you?

10  A.  Yes, I know they reported that.  But the data they have do

11  not support that.

12  Q.  What data in the report doesn't support the fact that the

13  115 people had no history of documented hands-on victims?  What

14  contradicts that?

15  A.  They reported that a large number of people were excused

16  from the program for various reasons.  One of those reasons

17  could have been--I'm pretty sure it would have been because they

18  didn't make those admissions.  But they didn't report that, and

19  they should have.  That's a standard in their field of research.

20  Q.  So you're guessing at what they may or may not have done or

21  who they might have kept in the program or who they might have

22  kept out?

23  A.  No, I'm dealing with the data they presented.  In that field

24  of research you must present those data.

25  Q.  Well, would you show me in here in the report--do you have a

1  copy of it?

2  A.  Yes, I do.

3  Q.  Would you show me in there what line, what sentence causes

4  you to question the statement that 115 of these people had no

5  documented hands-on victims?

6  A.  I can't.  They should have presented that data.  That's for

7  them, not for me.

8  Q.  So you have no factual data to dispute that?

9  A.  All I can do is assess whether or not they had a reasonable

10  cause to come to their conclusions.  It was their job as

11  researchers to present the data.  And that's a standard in

12  scientific research is to put the data in there.  They did not

13  do it.

14  Q.  So you have no actual basis to dispute the statement that

15  115 of these subjects had no documented hands-on victims?

16  A.  I have a scientific basis for saying that they do not have a

17  basis for their conclusions.

18  Q.  You have no factual data to dispute the statement that 115

19  subjects had no documented hands-on victims?

20  A.  I can't know.  It's impossible from the study.  I don't know

21  how else I can answer that.

22  Q.  Did you talk to these 115 people?

23  A.  No, of course not.

24  Q.  Did you look at the presentence investigation reporter's

25  review of the study?

1   A.  No, I looked at none of them.

2           MR. GAUMER:  That's all I have, Your Honor.

3           MR. RIGG:  Just a couple.

4                   FURTHER REDIRECT EXAMINATION

5   BY MR. RIGG:

6   Q.  Doctor, do you have any idea how many prisoners total would

7   have been through the sexual offender treatment program during

8   the time frame of this study?

9   A.  No, it wasn't reported.

10  Q.  So 115 could be a little of the people that went through or

11  a lot or you just don't know; right?

12  A.  I don't know.  That would be important data.

13  Q.  And these weren't random subjects of that total amount;

14  correct?

15  A.  From what I understood from the article, they were not

16  randomly selected.

17  Q.  So for all we know, they were selected afterwards because

18  they reported subsequent sexual contacts; correct?

19  A.  That's correct.

20  Q.  That would skew the data some, wouldn't it?

21  A.  Yes, that's why they needed to present the data.

22  Q.  And it is reported in the study that the number of prisoners

23  at Butner who did decline sexual offender treatment programs

24  weren't studied at all; right?

25  A.  That's correct.

1  Q.  And as a matter of fact, the study says that there may be no

2  conclusions as to that population since they're excluded from

3  the study; correct?

4  A.  That's correct.

5          MR. RIGG:  Thank you.  Nothing further.

6          MR. GAUMER:  Nothing.

7                                    (Witness excused.)

8          THE COURT:  Do you have any further evidence,

9  Mr. Rigg?

10          MR. RIGG:  Can I have just a second?

11          THE COURT:  Yes.

12          (Short pause.)

13          MR. RIGG:  No, Your Honor.  We have nothing further.

14          THE COURT:  Mr. Gaumer, do you have any testimony?

15          MR. GAUMER:  No, Your Honor.

16          THE COURT:  All right.  Mr. Rigg, I did want to tell

17  your client that I received a letter in this case from his

18  mother that's dated November 30, 2007.  I also have a letter

19  dated September 17, 2007, from Dr. Floyd C. Stevens, Jr., D.O.

20  And then there's also a letter from Susan M. Johnson, who I

21  believe is Dr. Johnson's wife.  Those are the letters I have.

22  Were there others, sir?

23          MR. RIGG:  I don't know, Your Honor.  I'll look.  I

24  was thinking there were a couple others.

25          That was all, Judge.

1      THE COURT:  All right.  Mr. Gaumer, I read your brief,

2  and I couldn't figure out when this study was.  Does the record

3  tell us?  I know that there are citations in the study to other

4  studies which are dated 2006.  Do you have a date for this

5  study?

6      MR. GAUMER:  I don't have a definitive date, Your

7  Honor.  My understanding is that it--well, I know this much;

8  that I believe the copy that I have talks about the study being

9  in press at the Journal of Family Violence and says do not

10  distribute without the authors' specific permission.

11      I received this study, I believe, in the last month,

12  month and a half and actually e-mailed Dr. Hernandez and asked

13  him for permission to use this study.  So I believe the data is

14  within the last year.

15      THE COURT:  Is it on the internet, or what's the

16  source of it; just the Bureau of Prisons?  Because I noticed

17  it's a Butner study.

18      MR. GAUMER:  It's not in press at this time, Your

19  Honor.  I did receive it through Department of Justice channels.

20  Dr. Michael Bourke and Andres Hernandez are both Ph.D.s.  I

21  believe they're both psychologists.

22      THE COURT:  Are they on staff at Butner?

23      MR. GAUMER:  Dr. Hernandez, I believe, was actually

24  the chief of the sex offender treatment program for many

25  years--I understand he may recently have left the Bureau of

1   Prisons--and I believe he worked with Dr. Bourke in the program.

2           THE COURT:  Okay.  Mr. Gaumer, I suppose I'm like

3   every other judge or, for that matter, a lawyer, but your brief

4   about--because I've had a number of these cases--Shipley,

5   Acosta, Johnson--and, of course, you raised a good question in

6   your brief, but I went back to Coon and Gall.  Here's what the

7   Supreme Court says:

8           "It has been uniform and constant in the federal

9   judicial tradition for the sentencing judge to consider every

10  convicted person as an individual and every case as a unique

11  study in the human failings that sometimes mitigate, sometimes

12  magnify the crime and the punishment to ensue."

13          So what do you think the sentence should be here?  I

14  know you think it should be more than the mandatory minimum.  I

15  read, I think, in part of your brief you urged the guideline.

16  But what's your sense about what sentence here is sufficient,

17  but not greater than necessary?

18          MR. GAUMER:  Your Honor, even when the guideline

19  system was mandatory, the Court was required to give out an

20  individual sentence determination within the parameters of the

21  guidelines.

22          THE COURT:  Well, you can say that, but we all know

23  that wasn't true.

24          MR. GAUMER:  No, Your Honor, I believe that was true.

25  I believe the Court had the authority within the guidelines--

1    that there were guideline ranges; but if there weren't things

2    covered by the guidelines, you could depart up or down.

3            THE COURT:  But there were many things, many, many,

4    many things too numerous to mention that we could not take into

5    account that go to the uniqueness of every human being.  That's

6    why they're now advisory.  That's part of the reason they're now

7    advisory.

8            So when you say when they were mandatory we treated

9    everybody unique, we couldn't take into account

10   socioeconomic conditions, we couldn't take into account the lack

11   of education.  Many things were off limits.

12           I do think that there's--both of these quotes, one in

13   the context of Coon and the standard of review on departures,

14   the other in the standard of review from the District Court to

15   the Court of Appeals, I think did emphasize to us what's right

16   for one person isn't right for another.

17           That was my only point, that when you say how can you

18   give X this many months and Y these many months, you know, my

19   answer is that everybody is different.

20           MR. GAUMER:  Well, Your Honor, the dilemma, I think,

21   of the federal sentencing process to some extent predates the

22   guidelines.  And the question that probably is historical in

23   nature is when the legislature defines what a maximum penalty

24   is, how is the Judge to determine what the specific penalty in

25   each individual case is?

1              I know from appearing in front of this Court, as well

2    as other Judges, that that is a difficult thing to determine in

3    many cases.  The sentencing guidelines when they went into

4    effect in 1988 or 1989, one thing they were predominantly

5    designed to do was to make the sentencing process more uniform

6    and to ensure that similarly-situated defendants were treated in

7    the same manner, not just geographically, but within the same

8    courtroom, in the same courthouse.

9              And I understand, of course, that there were problems

10   with the guidelines after Booker and Gall, and we are where we

11   are, and they're not mandatory.  But they are advisory, and they

12   inform the sentencing process in many different ways.

13             First of all, the guidelines to the extent they are a

14   set of recommendations, a set of principles that have been

15   promulgated by an empirical approach, then they are a scientific

16   methodology of telling us what an appropriate sentence generally

17   should be.

18             As far as those guidelines that are not designed by

19   the empirical approach, but were required by Congress, those

20   guidelines tell us what the sense is of Congress speaking on

21   behalf of the community as to the magnitude of the offense and

22   how severe the punishment should be.

23             That is not to say in any way, shape or form that I'm

24   asking the Court to apply the guidelines manditorily in every

25   case, because that's not the law and that's not what the Court

1   should do or--can do or should do.

2           In this particular case, if we were to look at the

3   sentencing guidelines as they exist today, the Defendant would

4   be looking, I believe, at a potential sentence twice that of

5   what he would face under the guidelines that were in effect at

6   the time of his offense in 2003, 2004.

7           When the guidelines were mandatory, the rule of thumb

8   was that the Defendant was entitled to the earlier guidelines if

9   they were more lenient in order to avoid any factors in

10  sentencing.

11          The guidelines aren't mandatory anymore, they are

12  merely advisory.  And an argument can be made that I cited that

13  because they are merely a recommendation, the most current

14  guidelines might be another measurement of informing the gravity

15  of the offense and how serious it is.

16          So this is a very complicated process, Your Honor, and

17  I appreciate the difficulty the Court goes through in making

18  these sentencing determinations.

19          So what I'm struck by is that under the past

20  sentencing guidelines the sentence could be twice what it is

21  under the current guidelines.  When I look at the most recent

22  cases that I've appeared before the Court on--and I'm talking

23  about Mr. Shipley primarily and Mr. Acosta--this case is more

24  like, I believe, Mr. Shipley than Mr. Acosta.

25          I believe the sentencing in Mr. Shipley's case was

1  about nine years.  That is very close to the 120-month guideline

2  sentence in this case.

3        Mr. Shipley, like the Defendant here, was an educated

4  person with a strong family support.  I believe this Defendant

5  with his education as a doctor actually should have known more

6  than Mr. Shipley that what he was doing was wrong and the harm

7  that child pornography inflicts upon children.

8        This Defendant stated that he was aware of what he was

9  doing was wrong; but then when he realized the FBI was cracking

10  down on child pornography, he decided to stop his activity.

11  That indicates to me that rather than his behavior being the

12  product of some sort of compulsion, that it was a deliberate,

13  intentional behavior.  He could stop it when he chose to.

14        We have the other guideline factors.  In its simplest

15  form, this offense can be committed by someone looking at one

16  image that's traveled in interstate commerce that involved a

17  lascivious display of genitals of a minor.  This case involved

18  hundreds of images.  He was on his computer hundreds of times.

19  He distributed images to other people.  He received them.  He

20  possessed them.

21        I believe when you look at all of those factors that a

22  sentence of 120 months, which is analogous to what was imposed

23  in Shipley as far as uniformity is concerned, would be

24  appropriate under the 3553 factors, and that's what I would ask

25  the Court to impose.

1          THE COURT:  Mr. Gaumer, do you think this report is

2     empirical support for the guideline sentence?

3          MR. GAUMER:  I do, Your Honor.  I found our exchange

4     with Dr. Rogers interesting.  Dr. Rogers talks about the--what

5     he thinks are the empirical flaws in this study.

6          If you look at Page 24 of the report, Dr. Hernandez

7     talks about this study is exploratory.  It's the first step in

8     what he hopes to be numerous studies, and he's inviting other

9     scholars to come in, and perhaps it will spark an interest in

10    the scientific community and encourage additional studies in the

11    area.  We encourage replication from other correctional systems

12    and treatment settings to expand the generalization of these

13    findings.

14         So this is the tip of the iceberg as far as these

15    doctors, Dr. Hernandez and Dr. Bourke, are concerned.

16         Dr. Rogers makes much of the fact that--and apparently

17    this isn't written quite the way that he wants it to be, but he

18    has no factual basis to dispute that there were 155 people in

19    the Butner study who were there because they were child

20    pornographers, and 115 of them said--or they had no incidence of

21    child sex offending in their presentence reports, no history.

22         And when they were later questioned--  He believes the

23    study is flawed because they didn't use some past

24    questionnaires, but he has no basis to know that there was

25    anything wrong with the questionnaires that they asked.  They

1   asked, "What's your true incidence of actual sexual offending

2   against the child?"  After they had been through the program,

3   they weren't going to get out early, as the Court noted, the

4   numbers basically reversed themselves.

5          The difficulty with using this study and in some

6   ways--  I am not in any way, shape or form, Your Honor, arguing

7   that because of this study that Dr. Johnson has in some way

8   perpetrated the sexual offense against a child.  I am not

9   arguing that.

10         What I am saying is when you look at this study, this

11  informs us as to the potential dangerousness of people who have

12  committed this type of offense.

13         THE COURT:  Right.  Here's the way I took it:  That

14  this is some evidence that a fact finder could conclude that the

15  Defendant may be dangerous.

16         MR. GAUMER:  That's correct, Your Honor.

17         THE COURT:  That's the spirit in which I thought it

18  was answered.

19         MR. GAUMER:  Thank you.

20         THE COURT:  Okay.  Mr. Rigg, before you give me your

21  summation about what sentence you think is appropriate here or

22  sufficient, but not greater than necessary, I'm confused as to

23  the offense conduct here was '04.  The indictment is not until

24  '07.

25         MR. RIGG:  Correct.

1        THE COURT:  I never had an explanation for the lapse

2  in time here.  What happened?

3        MR. RIGG:  They didn't charge him.

4        THE COURT:  I'm sorry?

5        MR. RIGG:  They didn't charge him.  They had searched

6  the place, taken his computer, they interviewed him, and then

7  for three years the other shoe didn't drop.  And I think that's

8  the complete opposite from saying, "Well, he's a doctor, and so

9  he should have known better."  He wasn't a doctor then.  He was

10 in medical school.  And he could have just said, "Well, the

11 other shoe is going to drop one of these days, so forget about

12 it."

13       THE COURT:  Well, I didn't see it addressed by either

14 you or the Government.  Is it significant, the delay?

15       MR. RIGG:  I think what's significant about it--  I

16 mean, they were within the statute.  They could charge him if

17 they wanted to.  It's what did he do knowing that he could be

18 charged?

19       THE COURT:  I'm sorry, it's what?

20       MR. RIGG:  What did he do knowing that he could be

21 charged?  Did he just give up?  Did he just say, "I'm not going

22 to help anybody," or did he say, "I am going to take the time

23 and expense and burden and everything else to continue to try to

24 become a doctor"?

25       THE COURT:  Okay.

1          MR. RIGG:  I think that says quite a bit about an

2    individual that he was still willing to make that kind of effort

3    to help people, knowing what he knew could happen.

4          THE COURT:  And does it speak to the safety of the

5    community and the dangerousness of the Defendant?

6          MR. RIGG:  Well, I disagree with Mr. Gaumer in this

7    respect.  He's saying, "Well, I'm not saying that Dr. Johnson

8    actually molested anybody, I'm just saying there's an 85 percent

9    chance of it," is kind of what you get from that from me.  If

10   they want to prove uncharged criminal conduct, prove it.  That's

11   the standard.  If you want to prove he molested somebody, prove

12   it.

13         THE COURT:  Well, when you have both--real offense

14   sentencing as we have, both sides do this, it's the concept

15   behind the old term "relevant conduct," isn't it?

16         MR. RIGG:  Yes.

17         THE COURT:  So that's not Mr. Gaumer, he's just trying

18   to do his job.

19         MR. RIGG:  But what he is doing in doing his job here

20   is he's trying to infer that the likelihood is that there is

21   some actual physical conduct.

22         THE COURT:  Answer my question.  Does the delay

23   between the offense conduct and the indictment, does that

24   mitigate for the Defendant?

25         MR. RIGG:  I think the fact that he was out amongst

1   the community for three years with no problems that anybody can

2   tell certainly shows that he doesn't seem to be much of a danger

3   to the community.

4          THE COURT:  The other thing that wasn't addressed by

5   either side, I take it that he's licensed to practice medicine

6   in the State of Michigan?

7          MR. RIGG:  He was.

8          THE COURT:  That's what I want to know.  When you say

9   he was, is he going to keep his license?  Does he have a license

10  now?  And, if so, will he keep it once the conviction becomes

11  final?

12         MR. RIGG:  As I understand it, the license currently

13  has lapsed, and you can be suspended for this kind of

14  conviction.  The suspension is not necessarily a lifetime event.

15  He can reapply and attempt to get the license back.

16         THE COURT:  And that's governed by Michigan law?

17         MR. RIGG:  Or whatever state he ends up going to.

18         THE COURT:  I see.  All right.

19         MR. RIGG:  Obviously, I was involved in Mr. Shipley's

20  case, so we all know the facts of Mr. Shipley's case.  And

21  whether or not it's appropriate to compare one Defendant to

22  another, one thing that is certainly different is the mental

23  health issues that are going on in this case as opposed to

24  Mr. Shipley's case.

25         And I think it is important for a couple reasons, the

1   most predominant one being that if the Government wants to say

2   that there were all of these images and that would warrant a

3   higher sentence, then you also have to consider whether or not

4   the type of mental affliction he had, particularly if it gets

5   him to basically be a collector of such things, are we talking

6   in that case about a disease process alone or criminal conduct?

7          I think that given the other factors that Dr. Rogers

8   talked about that there is a good reason to find that the number

9   of images is not as important in this case as it may be in other

10  cases because what you are seeing is a reflection of the disease

11  process itself rather than simply wanting to commit more and

12  more criminal conduct.  It's part of the compulsion part.  And

13  that is certainly a difference between the two.

14         The time difference between charge and when this was

15  found out certainly is a difference because you had the

16  opportunity to observe an individual knowing that he, you know,

17  in all likelihood would be charged; and what he did in the

18  community, what he did was entirely positive.  He did not

19  present a danger to anybody.

20         Obviously, he does have some enhanced responsibilities

21  with his family, particularly with his son because of the

22  medical issues that present itself, and how those will resolve

23  is simply a function of time.  Nobody is going to know until a

24  future date just what kind of problems his son may or may not

25  have.  But certainly, obviously, he wants to be there as soon as

1  possible in order to be there for his son.

2          As you know, I asked for what I think would be

3  sufficient, but not greater than necessary, five years.  Five

4  years is a long time in prison.  I think one of the things since

5  the sentencing guidelines came into effect that we have

6  forgotten is just how long things like five years in prison is.

7          The fact that Congress may have thought it was a good

8  idea to take everybody who would have been at 10 years and put

9  them at statutory maximum is something we can consider.  I don't

10  know how that really works.  I don't know--  Knowing the

11  legislative history--and we have discussed that before--there is

12  no factual basis for that, other than they decided to be tough

13  on child porn cases.  That's their prerogative.  But if they

14  want to do that, as you said in Shipley, they can make it

15  mandatory.  Until they do, it's just a suggestion.

16          It seems to me that what is clearly sufficient, but

17  not greater than necessary, would be the mandatory minimum, and

18  that's what we would ask for.

19          THE COURT:  Okay.  Mr. Rigg and Mr. Gaumer, because I

20  got this testimony this afternoon and this study that I just

21  read this morning, I'm going to have the Defendant allocute and

22  then I'm going to issue a written sentence.  So he's not going

23  to have a chance to see anything, other than I'm going to tell

24  him now what I'm going to do after I hear him allocute, because

25  allocution obviously sometimes makes a difference.  I've only

1   done this a couple of times, but I do want him to know and

2   whatever we can do to make this record.

3          So, Mr. Johnson, you've been here awaiting sentencing

4   a long time.  We got it set once before.  You wanted an exam.  I

5   continued it.  So in part I need some time to read the--a report

6   by Dr. Rogers and, as well, review the additional submission of

7   the Government made on Friday afternoon.

8          So here's what's going to happen:  I'm going to hear

9   from you because you have a right of allocution.  Then I'm going

10  to issue a written sentencing order.  And when I do, once you

11  get that and the clerk files it, which the clerk will, you'll

12  have 10 days from that time to appeal my judgment to the Court

13  of Appeals.

14         I have to tell you that, so I'm telling you now.  I'm

15  also going to put it in a written order.  Mr. Rigg knows this,

16  but even though he knows this, a Judge has the responsibility

17  under the rules to tell the Defendant that.  So I'm going to

18  issue a written opinion in your case, and from that you'll have

19  10 days to appeal that to the Court of Appeals if you disagree

20  with it.

21         The law further says that you have a right to a

22  lawyer.  If you can't afford a lawyer to help you with the

23  appeal, you have a Constitutional right to have a lawyer help

24  you with the appeal.  Do you understand that?

25             THE DEFENDANT:  Yes.

1          THE COURT:  Mr. Johnson, you have a right of

2   allocution, which is your opportunity to say anything you want

3   before sentence is pronounced.  Do you have anything you want to

4   say?  You can remain seated.  It's probably more comfortable for

5   you, and I'll be able to hear you better.

6          THE DEFENDANT:  Yes, Your Honor.  I'm, of course, very

7   sorry for this, and if I could just answer a few of the

8   questions you and the prosecutors had.

9          He makes a point of me stopping the activity because

10  the FBI came.  I was stopping the activity more or less before

11  they came gradually because I had finally received successful

12  treatment for the bipolar disorder.  I was started on a new

13  medicine in November, and I had started on a CPAP machine prior

14  to that, and the combination of those two things really changed

15  my life and changed the stresses in my life.

16         And I was stopping for those reasons.  I hadn't

17  stopped completely.  It wasn't like turning off a switch.

18  Obviously I still had material in my home when the FBI came.

19         As far as the lag time between search and indictment,

20  at the time of being served with a search warrant I secured

21  counsel other than Mr. Rigg.  And I asked them what I needed to

22  do to get this behind me because I was in med school, and I

23  couldn't go on like this to complete med school with this

24  hanging over me and how to do this.

25         And counsel at that time apparently--I wasn't privy to

62

1  their actual actions, but were approaching the Government and

2  running up against brick walls.  And eventually they returned my

3  retainer to me and said, "Cross your fingers and get on with

4  your life."  So that's what I did for three years.

5          I knew at the time it was wrong, of course I know now

6  it's wrong.  And all I can say for mitigating circumstances is

7  that after finally receiving adequate treatment and a new

8  medication, I was just a different person.  And it was amazing

9  the difference in me and in my life and no compulsions and no

10  need to do that.  And I had great self-actualization and

11  satisfaction in my work.

12          It is very unlikely that I will practice medicine

13  again.  I'll give it a try.  I'll see what the licensing

14  situation is like in five years or more.  But in any case, it

15  will be very difficult, if at all possible.  And that, combined

16  with long-term monitoring, I think is sufficient.  Thank you.

17          THE COURT:  All right.  We'll consider the matter

18  submitted.  We'll be in recess.

19          (Proceedings concluded at 3:10 p.m.)

20

21

22

23

24

25

1                       C E R T I F I C A T E

2              I, the undersigned, a Certified Shorthand Reporter of

3     the State of Iowa, do hereby certify that I acted as the

4     official court reporter at the hearing in the above-entitled

5     matter at the time and place indicated;

6              That I took in shorthand all of the proceedings had at

7     the said time and place and that said shorthand notes were

8     reduced to typewriting under my direction and supervision, and

9     that the foregoing typewritten pages are a full and complete

10    transcript of the shorthand notes so taken.

11             Dated at Des Moines, Iowa, this 5th day of January,

12    2009.

13

14

15                          /s/Christine E. Nuckolls
                            CERTIFIED SHORTHAND REPORTER
16

17

18

19

20

21

22

23

24

25